IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

ADRIAN DAWKINS,                )
                               )
            Plaintiff,         )
                               )
      v.                       )    1:14CV711
                               )
SBV, LLC, et al.,              )
                               )
            Defendants.        )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on Defendants SBV, LLC, SBV-Greensboro-I, LLC, SBV-Greensboro, II, LLC, Spectrum Business Ventures, Inc., and AG613, LLC's (collectively "Defendants") motion for summary judgment. (Docket Entry 22.) Also before the Court is Defendants' motion to stay all proceedings pending a ruling upon Defendants' motion for summary judgment. (Docket Entry 29.) For the following reasons, the Court will deny Defendants' motion to stay, and recommend that Defendants' motion for summary judgment be granted.

## I. BACKGROUND[1]

Plaintiff filed this action alleging race and retaliatory discrimination against Defendants[2] in violation of Title VII of the Civil Rights Act ("Title VII"). (*See generally* Complaint, Docket

---

[1] These facts are viewed in the light most favorable to Plaintiff.
[2] Plaintiff has named several entities as Defendants in this action. In its Answer, Defendants assert that: (1) they are unaware of an entity named "SBV, LLC," (2) SBV-Greensboro-I, LLC has no interest or involvement in the property Plaintiff managed, (3) SBV-Greensboro, II, LLC owns Lemans at Lawndale, (4) Spectrum Business Ventures, Inc. managed Lemans at Lawndale, and (5) AG613, LLC began managing Lemans at Lawndale in September 2013. (Answer ¶¶ 3-7, Docket Entry 2.)

Entry 8.) Plaintiff, an African-American female, was the property manager at Lemans at Lawndale ("Lemans"), a residential apartment complex acquired by Defendants during Plaintiff's employment.[3] (Dawkins Aff. ¶ 2, Docket Entry 25.) After acquiring Lemans, Ana Lewis ("Ms. Lewis"), a Hispanic female and former President of Real Estate Operations for Defendants (and Plaintiff's supervisor), decided to increase Plaintiff's pay from $38,000 to $45,000 per year during their initial meeting based upon Plaintiff's work experience.[4] (Lewis Aff. ¶¶ 10-11, Docket Entry 23-1.) Around this time, Plaintiff and Ms. Lewis also discussed staffing plans for the Lemans, and Ms. Lewis agreed to hire an Assistant Community Manager who was also an African-American female, Kenice Reed, who worked with Plaintiff under the direction of Lemans' previous owners. (*Id.* ¶¶ 9-10; Pl.'s Dep. at 33-35, Docket Entry 23-2.) Plaintiff thereafter hired Troy Richardson, an African-American male, as Lemans' Maintenance Supervisor. (Pl.'s Dep. at 40, Docket Entry 23-2.)

During Ms. Lewis' first visit to Lemans on June 27, 2013, she arrived at about 9:00 a.m. and discovered that the leasing office was closed with no personnel present. (Lewis Aff. ¶ 12, Docket Entry 23-1.) Ms. Reed appeared an hour later and indicated that Ms. Lewis would not be present in the office that day. (*Id.*) This left an "unfavorable first impression" on Ms. Lewis. (*Id.*) Nevertheless, Plaintiff remained employed with Defendants. (*Id.*) As to

---

[3] Plaintiff was originally employed by the entity from whom Defendants acquired Lemans. (Lewis Aff. ¶¶ 8-9, Docket Entry 23-1.) Around the time Defendants acquired Lemans, they also acquired other properties in the area including Lexington and Misty Creek. (*Id.* ¶¶ 4, 6.) Misty Creek included more than 500 apartment units, Lexington included 106 units and Lemans included 109 units. (*Id.* ¶ 7.)

[4] During the acquisition, Ms. Lewis initially hired another African-American female to assume responsibilities at Lemans. (Lewis Aff. ¶ 8, Docket Entry 23-1.) Plaintiff and Defendants dispute when Defendants learned of Plaintiff's employment with Lemans' previous owner. (*Id.*; Dawkins Aff. ¶ 4, Docket Entry 25.) The Court finds this dispute immaterial as to Plaintiff's employment discrimination action since Plaintiff was nevertheless hired by Defendants.

Defendants' computerized management system, Plaintiff was required to learn, and properly ensure that her staff met Defendants' expectations for their various roles. (*Id.* ¶¶ 13-14, Docket Entry 23-1; Pl.'s Dep. at 23-24, 43, Docket Entry 23-2.) Ms. Lewis observed an increasing number of residents complaining about maintenance issues. (Lewis Aff. ¶ 15, Docket Entry 23-1.) After several subsequent visits to Lemans, Ms. Lewis sent Plaintiff an email discussing her dissatisfaction with occupancy numbers and overall management at Lemans. (*Id.* ¶ 16, Docket Entry 23-1; Pl.'s Dep. at 66, Docket Entry 23-2.) The two also discussed Ms. Lewis' "perception that Ms. Reed was resistant to the pricing strategy implemented at the time of the Lemans acquisition." (Lewis Aff. ¶ 16, Docket Entry 23-1; Pl.'s Dep. at 83, Docket Entry 23-2.) During the same time period, Ms. Lewis discussed her concerns about Mr. Richardson's inability to handle work orders and repairs. (Lewis Aff. ¶ 16, Docket Entry 23-1; Pl.'s Dep. at 85, Docket Entry 23-2.) Plaintiff defended Mr. Richardson and did not fire him despite Ms. Lewis' concerns. (Pl.'s Dep. at 85, Docket Entry 23-2.)

On October 9, 2013, Ms. Lewis addressed concerns about tenant turnovers, particularly in light of the property size of Lemans. (Ex. 9, Pl.'s Dep., Docket Entry 23-2 at 44-45.) The email noted that Lemans' "bad debt [had] not accrued from August to September," and that "turnovers continue[d] to be excessive." (*Id.*) The email concluded by indicating that "this [was] a formal written warning regarding [Plaintiff's] performance." (*Id.*) Plaintiff responded and indicated that she was "willing to achieve and exceed budget expectations with proper training." (Ex. 10, Pl.'s Dep., Docket Entry 23-2 at 47.) Ms. Lewis later responded, informing Plaintiff that although she received training, Plaintiff needed to "take the time to practice and

3

read [the] tutorial sessions provided . . . ." (*Id.* at 46.) In addition, Ms. Lewis reiterated her concerns about residents vacating the property and complaints about maintenance services provided by Mr. Richardson. (*Id.*) Ms. Lewis stated that she was "getting dissatisfied calls from residents." (*Id.*) At her deposition, Plaintiff acknowledged receipt of these emails and the concerns of Ms. Lewis. (Pl.'s Dep. at 86, 101-02, Docket Entry 23-2.)

On the same day of the email exchanges, Ms. Lewis discovered that the Lemans' office was not properly staffed on several occasions. (Lewis Aff. ¶ 20, Docket Entry 23-1; Attachment 4, Docket Entry 23-1.) Plaintiff provided an explanation as to her absences from the office, and further sought clarification on the policies and procedures as to how much advance notice was required to request time off because it was not clearly stated in the Employee Handbook. (Attachment 4, Docket Entry 23-1.) In a response email, Ms. Lewis indicated that prior approval was required, that Plaintiff could not just "close the office and not service [Defendants'] residents, and that arrangements would be made to cover Lemans' office for scheduled absences. (*Id.*)

In her affidavit, Ms. Lewis referenced additional performance concerns, particularly tenant concerns about their individual units. (Lewis Aff. ¶ 21, Docket Entry 23-1.) Several tenants lodged their complaints with the City of Greensboro, which included "allegations of damage to ceilings, electrical issues with appliances, plumbing and related duct system malfunctions, as well as other general housekeeping deficiencies." (*Id.*) Plaintiff did not directly communicate with Ms. Lewis about the City concerns regarding tenant complaints. (*Id.* ¶ 24.) Ms. Lewis thereafter terminated Plaintiff on October 14, 2013, along with the other staff at Lemans (Ms. Reed and Mr. Richardson). (*Id.* ¶ 22.) As reasons for terminating

4

Plaintiff, Ms. Lewis cited "ongoing maintenance problems, lack of leadership, unreliability, as well as newly discovered submissions of housing complaints with the City of Greensboro." (*Id.*) Upon Plaintiff's termination, Ms. Lewis sought Ms. Moore, Lexington's property manager, to assume managerial responsibilities at Lemans. (*Id.* ¶ 23.) Ms. Moore, an African-American female, wanted to remain at Lexington; therefore, Ms. Lewis transferred Leigh Davis, a Caucasian female, from Misty Creek to Lemans. (*Id.*)

Three days prior to her termination, Plaintiff wrote a formal complaint letter to Ms. Lewis' supervisor, Kristy Strong. (Dawkins Aff. ¶ 12, Docket Entry 25.) In the letter Plaintiff stated her explanations for absences from work, and asserted that she followed protocol as set forth in the Employee Handbook. (Attachment 5, Lewis Aff., Docket Entry 23-1.) Plaintiff also addressed budgeting issues and requested additional training. (*Id.*) Lastly, Plaintiff addressed other issues previously raised by Ms. Lewis relating to property performance at Lemans. (*Id.*)

After filing a complaint with the EEOC and upon receipt of a Right to Sue Letter, Plaintiff thereafter filed the action pending before this Court. In her civil complaint, Plaintiff alleges discrimination based upon race and retaliation. (*See generally* Complaint, Docket Entry 8.) In her affidavit, Plaintiff states that she was treated unfairly by Ms. Lewis; for example, Plaintiff was not permitted to run promotional specials or waive application fees for new prospects while Ms. Davis was allowed to do so. (Dawkins Aff. ¶ 5, Docket Entry 25.) Plaintiff states that "Ms. Lewis provided coaching opportunities to [Ms. Davis] while she was in town . . . ." (*Id.* ¶ 6.) Plaintiff also alleges that Ms. Davis was in training to be the regional manager although she had no previous property manager experience. (*Id.*) Unlike Ms. Davis,

Plaintiff has 17 years of experience, but was never "given the opportunity to advance." (*Id.* ¶ 7.) Plaintiff further asserts that she performed better than Ms. Davis with regard to the company metrics, but Plaintiff "was fired and [Ms. Davis] was given [Plaintiff's] job." (*Id.* ¶¶ 8-9.) Rather than "receiving a true response to [her] concerns, [Plaintiff] was summarily fired three days" after addressing her concerns to Ms. Strong.[5] (*Id.* ¶ 12.)

## II. STANDARD OF REVIEW

Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate the presence of a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When making a summary judgment determination, the court must view the evidence and justifiable inferences from the evidence in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

---

[5] The letter was written by Plaintiff, Ms. Reed and Mr. Richardson. (Attachment 5, Lewis Aff., Docket Entry 23-1.)

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its terms. As the *Reeves* court noted:

> Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (emphasis added). In *Dennis*, a case decided after *Reeves*, the Court of Appeals for the Fourth Circuit noted that the *Reeves* court "instructs more broadly that factors on which the appropriateness of a judgment as a matter of law will depend in any case will include 'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Dennis*, 290 F.3d at 649 (quoting *Reeves*, 530 U.S. at 148-49) (emphasis in original). As discussed herein, the Court concludes that no reasonable jury could rule in Plaintiff's favor; thus, Defendants should be entitled to summary judgment as a matter of law.

7

## III. DISCUSSION

### A. Plaintiff's Retaliation Claim

Plaintiff asserts a claim for retaliation pursuant to Title VII which provides that it is unlawful:

> for an employer to discriminate against any of [its] employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To pursue any Title VII claim in federal court, a plaintiff must first exhaust administrative remedies by filing a charge with the Equal Employment Opportunity Commission ("EEOC"). *See Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim."); *Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 148 (4th Cir. 1999) ("It is axiomatic that a claimant under Title VII must exhaust his administrative remedies by raising [her] claim before the EEOC."). "[F]actual allegations made in formal litigation must correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005). Thus, "[t]he allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) (citation omitted). "Where . . . the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156

8

Case 1:14-cv-00711-WO-JLW   Document 32   Filed 02/26/16   Page 8 of 17

(4th Cir. 1995); *Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) (Title VII retaliation claim barred when administrative charges alleged only age discrimination).

Here, Defendants contend that the allegations in the EEOC charge only surround Plaintiff's discrimination claim based upon race. (Defs.' Br. at 14, Docket Entry 23.) In her Charge of Discrimination, Plaintiff only checked the "Race" box for her bases of discrimination, and the explanation Plaintiff provided in the subsequent section makes no mention of retaliatory treatment. (Ex. 15, Pl.'s Dep., Docket Entry 23-2 at 52-54.) In her Complaint, Plaintiff alleges that Defendants retaliated against her by "denying her opportunities for employment" since filing the EEOC complaint, and by "taking actions not directly related to her employment and/or by causing her harm outside the workplace." (Compl. ¶¶ 37, 48, Docket Entry 8.) In her response to Defendants' pending motion, Plaintiff fails to address Defendant's jurisdictional argument and instead discussed the burden-shifting analysis to support her argument that Defendants retaliated against her. (Pl.'s Resp. Br. at 9, Docket Entry 24.) It is undisputed that Plaintiff failed to explicitly raise a retaliation claim in her EEOC complaint. Neither can the Court infer that "a reasonable investigation of [her] administrative charge would have uncovered the factual allegations set forth in formal litigation." *Chacko*, 429 F.3d at 512; *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002) ("Administrative investigation of retaliation . . . could not reasonably be expected to occur in light of [plaintiff's] sole charge of race discrimination, and the investigation of the complaint did not touch on any matters other than race discrimination.") Plaintiff's formal complaint letter that was forwarded to Ms. Strong three days before Plaintiff's firing discusses Ms. Lewis' statements to Plaintiff about work attendance, and discussions between Plaintiff

9

and Ms. Lewis regarding property performance. (Ex. 1, Pl.'s Dep., Docket Entry 23-2 at 37-38.) However, nothing in this letter references racial discrimination so as to link Plaintiff's allegations in the EEOC charge to retaliatory treatment alleged in formal litigation.[6] Plaintiff's retaliation claim is thus barred.

### B. Plaintiff's Racial Discrimination Claim

Plaintiff claims that Defendants discriminated against her on the basis of her race. In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for claims pursuant to Title VII. Under the *McDonnell Douglas* analysis, Plaintiff has the initial burden of demonstrating a *prima facie* case of racial discrimination. *Id.* at 802. In a disciplinary discharge case, a plaintiff can meet this burden by proving: "(1) [s]he is a member of a protected class; (2) [s]he was performing satisfactorily; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment." *Austen v. HCA Health Servs. of Virginia, Inc.*, 5 F. App'x 253, 254 (4th Cir. 2001) (citation omitted). If a plaintiff establishes a *prima facie* case, the defendant can rebut the presumption of racial discrimination by articulating a non-discriminatory reason for the discharge. *McDonnell Douglas Corp.*, 411 U.S. at 804; *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455-56 (4th Cir. 1989). The plaintiff then must present evidence sufficient to create a genuine issue of material fact that the defendant's legitimate, non-discriminatory reason for the discharge is pretextual. *See Matvia v. Bald Head Island Mgmt.*, 259

---

[6] Moreover, based upon the evidence before the Court, it is not certain that the EEOC was made aware of this letter as part of its investigation. While the entire EEOC file is not part of the Court's record, attached to the Complaint is what appears to be a cover letter sent to the EEOC by Plaintiff's counsel. (Ex. A, Compl., Docket Entry 8-1.) This letter does not reference any retaliatory treatment.

10

F.3d 261, 271 (4th Cir. 2001). "[T]he plaintiff may attempt to establish that [s]he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves*, 530 U.S. at 143 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Thus, "[i]n order for plaintiff to prevent summary judgment from being entered against [her], [she] must establish that 'but for' racial discrimination she would not have been discharged." *Wall v. City of Durham*, 169 F. Supp. 2d 466, 474 (M.D.N.C. 2001). At all times Plaintiff bears the ultimate burden of persuading the Court that Defendants intentionally discriminated against her. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993) (citing *Burdine*, 450 U.S. at 252–53).[7]

Similarly Situated Comparator

Defendants argue that Plaintiff fails to set forth a prima facie case for discrimination because Plaintiff cannot identify a similarly-situated employee of a different race that was not terminated a result of poor performance, specifically failing to adequately staff property, failing to advise the company of housing authority violations, and failing to properly manage staff to meet company expectations. (Defs.' Br. at 17, Docket Entry 23.) In cases where a plaintiff has "based their allegations completely upon a comparison to an employee from a non-protected class . . . the validity of their prima facie case depends upon whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Burdine*, 450 U.S. at 258 (1981)). "In the employee disciplinary context, '[t]he similarity

---

[7] The parties here do not dispute that the first and third elements are satisfied. Defendants clearly argue that Plaintiff fails to establish the fourth element. As to the third element, the Court will address Defendants' "performance" arguments within the Court's analysis of Defendant's non-discriminatory reasons for terminating Plaintiff's employment.

11

between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.'" *Kelley v. United Parcel Serv., Inc.*, 528 F. App'x 285, 286 (4th Cir. 2013) (unpublished) (citing *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)). Thus, a showing of similarity "would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Locke*, 387 F. App'x at 359 (internal quotations and citations omitted).

Ms. Davis, a Caucasian property manager also under Ms. Lewis' supervision, is the only non-African-American property manager which Plaintiff references in regard to disparate treatment. In her affidavit, Plaintiff asserts that Ms. Davis consistently underperformed and was not terminated. (Dawkins Aff. ¶¶ 7-11, Docket Entry 25.) Plaintiff asserts that Ms. Lewis was permitted to use special tools to improve property performance, was "propped up and supported," and received attention from Ms. Lewis that Plaintiff did not receive. (*Id.* ¶¶ 5-7.) Ms. Dawkins further indicated that her company metrics were better than Ms. Davis', yet Ms. Davis received Plaintiff's job after she was fired. (*Id.* ¶¶ 9-10.) However, in her deposition, Plaintiff testified that she was unaware of whether Ms. Davis had received emails regarding performance.[8] (Pl.'s Dep. at 70, Docket Entry 23-2.) In her managerial capacity, Ms. Lewis indicated in her affidavit that she had in fact discharged at least 9 employees (including managers and assistant managers) throughout 2013 prior to Plaintiff's termination. (Lewis

---

[8] Defendants also note that prior to the filing of Plaintiff's EEOC complaint, Ms. Davis received a written warning via email about performance concerns. (Lewis Aff. ¶ 25, Docket Entry 23-1.) Plaintiff was not employed with Defendants at this time.

12

Aff. ¶ 27, Docket Entry 23-1.) Only 2 of the 9 employees were African-Americans, and all 9 of them, irrespective of race, "failed to meet the performance expectations for [Defendants'] managers." (*Id.*)

Here, Plaintiff fails to identify an individual who is "indeed" similarly-situated that received more favorable treatment than Plaintiff. *Locke*, 387 F. App'x at 359. It is clear that both Plaintiff and Ms. Davis were in property management positions, and both under the direct supervision of Ms. Lewis. However, Plaintiff has not produced facts that Ms. Davis engaged in the similar conduct as Plaintiff that lead to her termination. Instead, Plaintiff admits that she did not know whether Ms. Davis received emails about her performance. (Pl.'s Dep. at 70, Docket Entry 23-2.) Defendants argue that the only true similarly-situated comparators (the majority of which were Caucasian or Hispanic) in fact received the *same* treatment as Plaintiff, that is, ultimately being discharged for failing to meet performance expectations. (Lewis Aff. ¶ 27, Docket Entry 23-1.) Based upon the evidence before the Court, Plaintiff simply cannot establish a prima facie case of racial discrimination in the context of disciplinary discharge because she cannot demonstrate that similarly-situated property managers were treated differently. *See Kelley*, 528 F. App'x at 286 (concluding that plaintiff was not similarly situated as comparator because both were not engaged in the same conduct); *Choice v. ThyssenKrupp Indus. Servs., NA, Inc.*, No. 6:13-CV-479-TMC, 2015 WL 2364926, at *2-3 (D.S.C. May 18, 2015) (unpublished) (holding that the plaintiff's complaint and affidavit are "too vague and conclusory to establish a genuine issue of material fact" because the plaintiff "does not indicate which employees have used phones in the facility without being disciplined, or which employees called into work to stay home even though they were scheduled to work

13

and were not disciplined"); *Hess v. Atl. Marine Corps Communities Prop. Mgmt., LLC*, No. 7:13-CV-18-BO, 2014 WL 1321001, at *4 (E.D.N.C. Apr. 1, 2014) (unpublished) (plaintiff "failed to present any evidence showing that another similarly-situated . . . employee was treated more favorably than she was under similar circumstances"); *Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 207 (M.D.N.C. 2006) *aff'd*, 242 F. App'x 75 (4th Cir. 2007) (unpublished) (concluding that the plaintiff's descriptions of comparators "show these [comparators] did not have a series of performance problems similar to [p]laintiff"); *Truesdale v. Potter*, No. 1:01CV00427, 2003 WL 1522945, at *6 (M.D.N.C. Mar. 24, 2003) (unpublished) (finding, inter alia, that there is no indication in the record that comparators' "alleged inappropriate conduct was similar to the allegations of [p]laintiff's inappropriate behavior").

Pretext

Even assuming Plaintiff set forth a prima facie case of racial discrimination, Defendants have offered legitimate nondiscriminatory reasons for Plaintiff's termination, and Plaintiff fails to present evidence sufficient to create a genuine issue of material fact that the reasons are merely pretext for discrimination. *Matvia*, 259 F.3d at 271. Defendants assert that Plaintiff's termination was based upon poor performance, including "ongoing maintenance problems, lack of leadership, unreliability, as well as newly discovered submissions of housing complaints with the City of Greensboro." (Lewis Aff. ¶ 22, Docket Entry 23-1.) The record presents several instances where Ms. Lewis addressed concerns to Plaintiff.[9] Plaintiff argues that her dismissal was in fact pretextual, albeit without any first-hand knowledge of similar conduct

---

[9] This evidence also directly relates to whether Plaintiff was meeting company expectations, which is necessary to establish a prima facie case of discrimination in the context of a disciplinary discharge. *Austen*, 5 F. App'x at 254.

14

from other property management employees under Ms. Lewis' supervision. (Pl.'s Dep at 70, Docket Entry 23-2.) Plaintiff presents evidence of objective metrics to show that her property performance was improving at a faster speed than Misty Creek (managed by Ms. Davis). (Dawkins Aff. ¶¶ 9-10, Docket Entry 25; Ex. 1, Docket Entry 25 at 6-14.) Defendants state that "each property has distinct budgetary issues and not every property is managed the same." (Lewis Aff. ¶ 25, Docket Entry 23-1.) Defendants do not dispute that Ms. Lewis spent more time at Misty Creek, a property nearly five times larger than Lemans; nor do they dispute that "move-in incentives are not universally applied" to all properties. (*Id.* ¶¶ 15, 25.) While the purpose of Title VII's comprehensive framework provides an avenue to address employment discrimination, "[i]t is not for this court or any other governmental agency to direct the business practices of any company." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992). Thus, when an employer, like here, "articulates a reason for discharging the plaintiff not forbidden by law, it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)); *see also Grice v. Baltimore Cty., Md.*, 354 F. App'x 742, 748 (4th Cir. 2009) (evidence of nondiscriminatory motive insufficient to support claim of unlawful discrimination).

Plaintiff relies upon her affidavit, as well as the affidavits from two other employees, Mr. Richardson and Gina Richardson to show that Defendants' termination was pretextual. (Docket Entries 25-27.) Mr. Richardson and Ms. Richardson's affidavits contain both conclusory statements and information already in the record. Both affidavits provide very

15

little support other than their perception of preferential treatment that Ms. Davis received in comparison to how Defendants treated Ms. Lewis. Ms. Richardson and Mr. Richardson both applaud Plaintiff's quality of work. (Gina Richardson Aff. ¶ 5, Docket Entry 26; Troy Richardson Aff. ¶ 6, Docket Entry 27.) However, the opinions of Plaintiff's co-workers as to her quality of work are nearly inconsequential. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir.), *cert. denied*, 531 U.S. 875 (2000); *see also DeJarnette*, 133 F.3d at 299 (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991)), in that co-workers' opinions as to employee's quality of work is "close to irrelevant"). In her own affidavit, Plaintiff centers most of her statements on her performance ratings (through Defendants' company metrics) in comparison to the performance of Ms. Davis' property. However, what amounts to sufficient "performance" is not for Plaintiff to decide. In fact, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins*, 203 F.3d at 280 (internal quotation and citation omitted). Plaintiff's pretext argument is also weakened by evidence showing her response to emails, and her complaint letter, which all are completely devoid of allegations of discrimination based upon race. *See Sellers v. Giant Cement Holding, Inc.*, No. CA 3:11-2803-JFA-SVH, 2013 WL 4436470, at *14 (D.S.C. Aug. 14, 2013) (unpublished) ("Plaintiff's pretext argument is undercut by the evidence showing that he responded to his poor performance evaluations on several occasions and never indicated that he felt he was being reprimanded because of his race.") In sum, nothing in the record suggests that Defendants' reason for terminating Plaintiff was false, and that racial discrimination was the real reason. Because no reasonable jury could conclude that Plaintiff could prove Defendants'

nondiscriminatory reasons for termination were a pretext to racial discrimination, Defendants' motion for summary judgment should be granted.[10]

### C. Defendants' Motion to Stay

Defendants also seek to stay all proceedings (Docket Entry 29) in this matter pending a ruling on their motion for summary judgment. It appears that this motion is now moot. Therefore, it is denied.

## IV. CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' motion for summary judgment (Docket Entry 22) be **GRANTED**.

**IT IS HEREBY ORDERED** that Defendants' motion to stay all proceedings (Docket Entry 29) be **DENIED as Moot**.

Joe L. Webster
United States Magistrate Judge

Durham, North Carolina
February 26, 2016

---

[10] Although not asserted as a separate cause of action, Plaintiff also briefly alleges in her Complaint that she experienced continued harassment from Defendants. (Compl. ¶¶ 21-23, Docket Entry 8.) In her deposition, Plaintiff indicated that Ms. Lewis' "tone through phone calls was harassing." (Pl.'s Dep. at 152, Docket Entry 23-2.) A rude tone is not severe and pervasive so as to create a hostile work environment. *Cureton v. Montgomery Cty. Bd. of Educ.*, No. CIV.A. AW-09-334, 2009 WL 4017897, at *6 (D. Md. Nov. 18, 2009) (unpublished).